Good morning, may it please the court and counsel. Omar Coria was convicted of drug trafficking conspiracy following a trial along with other related drug offenses. He was also acquitted of possession with intent to distribute 20 kilograms of heroin. Following the trial, Mr. Coria, through counsel, through me frankly, contacted the assistant United States attorney in the attempt to establish a safety valve proffer to qualify him for the application of the safety valve reduction. This proffer was scheduled on three occasions. During the first occasion, Mr. Coria, his counsel, actually both of his counsel, arrived for the proffer and were told that there was no Spanish interpreter available. The assistant United States attorney offered to act as the interpreter herself, which we believed would be an inherent conflict of interest, and I believe the record reflects I mentioned that to the district court as well. During the second scheduled proffer, Mr. Coria was not brought over to the courthouse until the parties had approximately somewhere between seven and ten minutes to complete the proffer, depending on whose calculation of time one relies upon. After that seven to ten minute proffer was completed, the assistant United States attorney, who was assigned to the case at the time, contacted counsel, me, and indicated that she did not believe that Mr. Coria had been completely forthcoming during that proffer, during those seven to ten minutes. In subsequent conversations, which took place in large part by email and were actually submitted to the district court for review, the parties discussed the nature of the limited proffer and Mr. Coria's inability to tell the government everything he knew and make a full statement in seven to ten minutes of time. The district court encouraged the parties strongly to meet for a third proffer. A third proffer was scheduled several months later, and for upwards of one and one-half hours, Mr. Coria met with an assistant United States attorney, two agents of the attorney, along with counsel. During that period of time, Mr. Coria presented, gave a statement that was so lengthy and so detailed, it actually took an eight-page, single-spaced, DEA-6 report to recount all the information. In that proffer, he provided names, dates, places, manner and means, and all of the details that he could recall about any drug transaction. At no time during this proffer did he refuse to answer questions. At no time during this proffer did he make any statement that was contradictory to the evidence in the case. Despite this detailed proffer, the government continued to oppose the application of the safety valve. Specifically, the government argued at the district court, and continues to argue here before this court, that there were unanswered questions. Three, in particular. The government says a myriad in its brief, but then identifies three. One is the question of how Mr. Coria and his brother, Mario Coria, could have coded language conversations, that that indicated a more in-depth exposure to drug trafficking. Mr. Coria answered this question. He told the government during the proffer, also during sentencing, that Mr. Coria, Mr. Omar Coria, and Mr. Mario Coria met prior to their telephone conversations and developed this coded language. That this was an in-person meeting, and during that meeting, they developed this language so that their calls could not be intercepted by law enforcement, which of course, they were, and we're here today. The second question was why Mario Coria, who was a known drug trafficker, would trust Omar Coria, who was not a known drug trafficker, with a kilogram quantity of cocaine. And again, that question was answered. They're brothers. Mario Coria is the older brother of Omar Coria. They have a close familial relationship. Omar Coria admitted that he had previously become aware that his brother was involved in drug trafficking. But it's not a stretch of logic at all to consider that an older brother would entrust his very close younger brother with a quantity of drugs. And third, the question whether Mr. Why Mario Coria would give Omar Coria some discretion over setting the price of the drugs. Again, this is a familial relationship. These two brothers are very close. The government's intercepted phone calls indicated hundreds of calls between the brothers, the overwhelming majority of which did not involve drug trafficking. Those questions were further answered, were fully answered. Well, the government particularly emphasizes his having said that he had never sold or even seen heroin or cocaine prior to February 21st, 2012. And then the government goes on and says the call records plainly contradict that account. But Omar Coria did not say that. In fact, what he told the government during the proffer, and it's, I recounted the government's proffer report, essentially in full in my brief. And I did that for a reason, not to irritate the court, but because I think it's important to see the content of what was reported from that meeting. Mr. Coria, in fact, said that he had seen drugs. That what? He had seen drugs in his brother Mario's possession on a prior date. He didn't know whether they were heroin or cocaine. That distinction was irrelevant at the time. But in fact, he had seen them and he was specific about that in his statement, both to the government and to the district court. But the district court relied upon essentially two phone calls. In both phone calls, they're between the brothers, Mario and Omar Coria. And the brothers are talking about a bad kilogram of cocaine, the kilogram of cocaine that Omar Coria clearly admitted to possessing and intending to sell. They reference prior, other kilograms of cocaine. Those were the kilograms of cocaine that Omar Coria admitted to seeing in his brother's garage at least a month prior to the events in question in this case. Nonetheless, the district court essentially relied upon one word, one word in those conversations, and that was the word soft. The district court said, looking at these calls and the content of these calls, the one word that stands out is the fact that they said that these drugs were softer. The district court interpreted that to be a reference to the tactile, as the judge said, the tactile nature of the drugs. But there's no evidence that soft in this content meant the tactile nature of the drugs. In fact, as I state in my brief, there are potentially 25 different definitions under the Merriam-Webster definition of soft. Any of those could apply here, and that could include rounded edges or just the actual visual picture of these packages. The safety valve was intended to apply to individuals, low-level, first-time, non-violent drug offenders, who inform the government of their knowledge about all relevant circumstances related to the offense in question. The burden lies squarely on the defendant to establish that he is eligible for the application of the safety valve. And the court's decision is reviewed for clear error. But in this case, the court's decision was contrary to both the clear evidence and to reason. Mr. Corey's statements were consistent with the evidence. They were internally consistent. And he had no motivation to make a statement anything other than the truth. He'd already been convicted. He had nothing to gain by lying. And for these reasons, I would ask the court to reverse and remand this matter back for resentencing. If there's no further questions, I'll reserve my time. Okay. Thank you. Thank you, Your Honor. Mr. Rothbard? May it please the court, my name is Richard Rothbard, and I represent the United States. The district court did not commit clear error in finding that defendant was not entitled to safety valve relief because he failed to truthfully and completely provide information in a safety valve interview. The information provided by Mr. Coria, the defendant, was contrary to the call records that had been reviewed by the court, along with several submissions. And the defendant had an opportunity to address those inconsistencies during the sentencing hearing and failed to do so. Because defendant failed to satisfy his burden to prove beyond a preponderance of the evidence that his safety valve interview provided full and complete information to the government prior to his sentencing, the district court did not clearly err. The defendant was convicted after a four-day trial on February 15, 2012, and then participated in a safety valve interview on March 9, 2016. All right. 2012 and 2016? I'm sorry, that's incorrect, Your Honor. The trial took place in February of 2015. The safety valve interview took place in March 9, 2016. More than a year later. That's correct. Now, defense counsel makes hay of the fact that there were three attempted safety valve interviews. And first, just to clarify, the use of the term proffer is not appropriate here. These were safety valve interviews. The information provided by the defendant was usable against him at the sentencing hearing. Thus, when you address the incentive of the defendant to tell the truth, had he been truthful about his prior involvement in drug transactions, that information could have been used as an enhancement for the offense level for the defendant and certainly would have cut against him in the consideration of any 3553A factors. So when defendant did participate in the third safety valve interview, the only interview upon which the government relies in contending that he was dishonest, and the only interview upon which the court relied upon in sentencing the defendant, it was determined that he had been untruthful in primarily his statement that he was not involved in drug trafficking prior to February 21st and 22nd of 2012. Now, as defense counsel addressed, there were several inconsistencies with regard to the call records and statements made by the defendant during his safety valve interview. First of which is the use of agreed upon coded language. Defense counsel claims that defendant admitted that they developed this code at a meeting before the first call transcript that's reviewed on February 21st, 2012. But there's no reference to the development of code in the safety valve interview report for the DEA-6. So this is information that's outside the record. There's no record that defendant told the government, I developed this code with my brother before this call. It's just something that is inferrable based on the fact that they had this agreed upon code that they both comfortably used throughout their several recorded conversations. And this code was used for the type of drugs. They referred to it as motors and paint. The price of the drugs, they said $24,500, $25,000 when they were referring to a kilogram of cocaine costing $24,500 or $25,000, and the quality of the cocaine. When they used numbers like 75, 85, and 95. These are agreed upon terms the defendant and his brother had discussed previously and used just four days after the wire went up on his brother Mario Correa's phone on February 21st, 2012. The calls also reflect defendant's power to negotiate the price. Now defense counsel says that because they were brothers, they had a trusting relationship. But if this was truly defendant's first experience in dealing drugs, would he be empowered to negotiate a $24,500 transaction? The district court in its discretion decided that it wasn't plausible and that was not clear error for the court to do so. Furthermore, the call records reflect a familiarity with the customers. You see reference to my buddy. He talks about an individual named Beto and how he told defendant Mario Correa that Beto would try the drugs in advance when two people came over to defendant's apartment and tested the drugs and determined they were of low quality. And he also talks about his Dominican guy. So there are several references here to customers by the defendant on these call records reflecting prior experience in drug trafficking. Furthermore, there were two specific examples that the court highlighted as examples in particular reflecting the defendant's prior experience in the drug trafficking business. It was the wrapping of the drugs. Prior to February 21, 2012? That's correct, your honor. The defendant referenced on a call on February 22, 2012, the wrapping of the drugs and how they were different than a prior occasion. He said that his buddy noticed it too. On a separate call, he also mentioned the texture of the drugs being different from another occasion, saying that they were more soft and simpler. Now, the defendant argues that this could simply be a reference to a January 2012 occasion when defendant says he saw some drugs in his brother's apartment. But if you look at the actual record in the safety valve interview, what defendant said is that in January 2012, he saw two bricks wrapped in black electrical tape in an aluminum bucket in his brother Mario Correa's car inside of his garage. So to be able to make a comparison of drugs on February 2012 and their texture, the softness of them, and talking about bricks here, it certainly goes beyond just simply viewing two bricks of cocaine on another occasion. And that's what the district court determined based on the district court's common sense and experience in this case. If there are no further questions from the court, we simply ask that the court affirm the district court's sentencing determination and find the defendant was ineligible for safety valve relief. OK, thank you, Mr. Rothblatt. So Mr. Winslow, I mean, Ms. Winslow, sorry, would you like another minute? Yes, please, Your Honor. Very briefly in response, the government dismisses the reference to the three prior attempts. But I think the three prior attempts are important, the three attempts to have a safety valve meeting, if the prosecutors prefer. Because the granting or the application of the safety valve reduction is limited to those who make a good faith effort to cooperate with the government, the fact of repeated attempts to meet with the government and provide this information, even over the government's objection repeatedly, does show good faith. The government suggests that Mr. Coria would have something to lose if he admitted to additional drugs, but the quantities of drugs that we're talking about in this case, because it did include the 20 kilograms of heroin for the conspiracy purposes, would not have been affected in any material way by admissions of prior conduct. They would not. In particular, because Mr. Mario Coria, who was most certainly the more culpable of the brothers, had already been sentenced to a 120-month term in this case. So it's clear, I think the writing was on the wall, if you will, that Judge Lee did not intend to sentence Mr. Omar Coria to a greater sentence, even if he had admitted to additional drugs. It wouldn't have made a practical difference. With respect to whether or not Mr. Omar Coria had the ability to set the price of drugs, in fact, he did not. The price was set by Mario Coria, and Omar Coria was told to get as much as he could for the drugs. That's not akin, it's not equivalent to setting the price of the drugs. I see my time has expired. I would ask the Court to remand this case to the District Court for resentencing. Okay. Thank you, Ms. Loewen. Thank you, Ms. Loewen.